A. C. STACEY, Plaintiff-Appellant,

v.

SEA–DRILLING CORPORATION and Insurance Company of North America, Defendants-Appellees.

No. 28305.

United States Court of Appeals, Fifth Circuit.

May 4, 1970.

Donald V. Organ, New Orleans, La., for plaintiff-appellant.

George A. Frilot, III, E. Jack Green, Jr., George B. Matthews, New Orleans, La., for defendants-appellees.

Before THORNBERRY, COLEMAN, and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge:

A. C. Stacey, the appellant, was greviously burned while welding aboard a drilling tender in the Gulf of Mexico. He sued his employer and its insurer under both the Jones Act, 46 U.S.C.A. § 688, and for unseaworthiness. The jury found that the vessel, SEA DRILL NUMBER 7, was not unseaworthy but separately found Sea-Drilling Corporation negligent. In response to a comparative negligence instruction the jury found that Mr. Stacey was 85% contributorily negligent. The ascertained damaged of $12,500 were accordingly reduced by 85% and judgment entered for $1,875. Such a limited recovery for burns so extensive has been subjected to critical review, but we conclude that the judgment must be affirmed.

On February 14, 1965, Mr. Stacey was the only welder aboard SEA DRILL NUMBER 7. Although he was not a certified welder until after this accident, he had had six weeks training in welding at the Alabama Dry Docks in Mobile. During his employment with Sea-Drilling Stacey had welded for two months in the spring of 1964, and continuously after September, 1965. By his own admission, he had represented to Sea-Drilling that he had previous welding experience with Penrod Drilling Company and therefore knew the basic safety principles in welding.

On the day of the accident SEA DRILL NUMBER 7 was backed away from the drilling platform which it served. Stacey's instructions were to

shorten and splice five supply lines running from the tender to the drilling rig. Three of the lines were accessible to a permanent walkway at the bow of the ship. The other two were diesel fuel lines which could be reached only by a makeshift scaffold, suspended over the water from the vessel's handrail.

The first three lines were readily severed. During this operation the valves on the adjacent diesel lines were open and Stacey observed diesel fuel dripping from the ends of those lines.

While cutting proceeded on the first three lines the valves were kept open to evacuate any drainage. Around 5 o'clock, p.m., appellant closed the valves of the diesel lines and began cutting out sections of each of them with his acetylene torch. While cutting he noticed "some burning that looked like fuel." When the burning ceased appellant assumed there was only a small residue of fuel coating the line. Next, he proceeded to burn off the residue near the ends of the line instead of flushing the lines with water. Evidence showed that there were hoses available and a connection near the bow where Stacey worked. After both end sections had been cut away, appellant and his helper went below, ground the sections for later fitting, and ate supper.

Resuming his work, Stacey tacked the freshly beveled piece to the rough end of the line as his helper supported it in place. This was accomplished on the walkway. Again, there was a flare from diesel fuel when Stacey waved his torch near the end of one pipe to check for residue. At this point he considered finding out whether the valve on the line was still closed, but did not do so. Next, Stacey donned his welding shield (for the cutting he had worn only goggles) and descended to the scaffold. The sea was choppy and the wind was up but Stacey had some protection because he was below deck level.

Within a minute Stacey noticed that the welding sparks were not normal. To him they looked like pieces of metal that were on fire. He continued to weld momentarily, believing that the source of the trouble, diesel fuel seepage, would burn away. This, however, did not occur. Instead, about a minute after he started to weld, Stacey observed a small blaze on his clothing at the level of his stomach. Raising his shield Stacey saw that he was afire. As he sprang to the deck he attempted to rub out the fire with his welding gloves. Seeing that his helper was absent he ran aft to the fire station, some sixty feet away. His cries brought a fellow worker to the scene who doused him with a hose. The driller, Kirby Franks, arrived shortly afterward and assisted in cutting away Stacey's clothing so that first aid could be administered. At this time Franks smelled diesel fuel and observed it on the appellant's clothing.

The Coast Guard rescue helicopter arrived in an hour and flew the victim to Ochsner Foundation Hospital in New Orleans. Throughout this time appellant was, of course, in extreme pain. When the wounds were finally cleaned he was first administered a pain killer. Until April 3, when Stacey was released, he suffered considerable pain, particularly during and after whirlpool baths when the bandages were changed. He frequently underwent skin grafts, ultimately amounting to 2½ square feet of the body surface.

Mr. Stacey returned to his job early in May. His major difficulty with the burned area has been irritation from perspiration. Also, his left arm will not stretch to full height because of the tightness of the graft.

Stacey and Franks were the sole witnesses to the accident so their credibility crucially affected the outcome. Sea-Drilling first attempted to impeach Stacey's testimony concerning weather conditions and the reasons for the helper's absence at key times. It was pointed out that the ship's log showed that the wind velocity was eight to fifteen miles per hour and the seas were six feet, while Stacey testified that they were

much greater. Second, Stacey testified that his helper disappeared, whereas he admitted on cross examination that he had permitted his helper to absent himself to unload another boat. On direct examination Stacey denied that he had received any instruction from safety manuals. However, on cross examination Stacey admitted that he knew welders should have a helper and fire extinguishers nearby, but thought the regulation was applicable only to work on the drilling platform. Later, the driller, Kirby Franks, testified that the material contained in a Marine Region Safety Manual was discussed at weekly safety meetings which the appellant sometimes attended.

With this background Sea-Drilling turned its cross examination to the question of damages.

Generally appellant claimed to have been disabled from the time of the accident until the early part of May, 1965. The claim for $100,000 damages was not itemized or particularized.

■ The cross examination which has been vigorously attacked on this appeal was as follows:

BY DEFENSE COUNSEL:

"Q. As a matter of fact, your earnings have been greater since you returned to work than they were before this accident?

"A. Yes, sir.

"Q. You also maintain an upholstering business near your home, don't you?

"A. Yes, sir.

"Q. Did you lose any revenue because of this accident in your upholstering business?

"A. Yes, sir.

"Q. Do you report the revenue that you make from your upholstering business when you make out your income tax?"

The defense had Stacey's income tax returns and knew that he had made no report on this item.

At this point plaintiff's counsel objected. The objection was overruled and the witness was required to answer. The answer was in the negative, but the witness was allowed to explain that the income from this source was too negligible to warrant bookkeeping costs.

Appellant argues that since no claim had been asserted for loss of earnings from the upholstery business the scope of the cross examination was impermissibly broad and its admission was highly prejudicial. On the other hand, the appellee stresses that the claim was for disability during the period before Stacey resumed work, thus rendering relevant the questions about the upholstery business. Conceding that no specific claim for loss of upholstery income was made, appellee nevertheless urges that upholstery earnings are relevant to the amount of wages lost.

The line of cross examination was competent if it shed light on appellant's credibility or if it was relevant to the issues in litigation.

Although the complaint had not mentioned losses from the appellant's personally conducted upholstery business, that does not necessarily mean that it was not relevant to the issues in the case. We are unable to see how it was irrelevant to an over-all claim, stated, as this one was, in general, rather than specific, terms. If the income from the business perchance had increased while Mr. Stacey was away from his welding employment the jury would have been entitled to weigh that for whatever light it might reasonably have reflected upon how extensively or painfully or disablingly he had been injured. The nature and the extent of the plaintiff's injuries was one of the paramount issues in the litigation. We, therefore, cannot hold that the trial judge abused his discretion as to the relevancy and materiality of this testimony.

■ As to the use of the income tax return and the failure to report income from the upholstery business, see O'Connor v. Venore Transportation Com-

pany, 1 Cir., 1965, 353 F.2d 324. This was a suit under the Jones Act and for unseaworthiness. It was there held that the plaintiff's income tax return and his failure to report certain earnings could be used in an effort to discredit his veracity on the witness stand.

■ It is next contended that the trial court in its instructions to the jury and in the submission of interrogatories reversibly failed to comply with the teachings of Page v. St. Louis Southwestern Railway Company, 5 Cir., 1963, 312 F.2d 84.

Among others, the following interrogatories were submitted to the jury, which responded as indicated:

"3. Was the defendant Sea-Drilling Corporation negligent?

Yes.

"4. If your answer to No. 3 was 'yes', then was the negligence of the defendant Sea Drilling Corporation a proximate cause of the accident?

Yes."

The appellant says that "proximate cause is no longer the test"; that its use in a charge to the jury is improper.

In pertinent part the trial judge charged as follows:

"* * * This is not just land base negligence, this is negligence under a special federal statute * * *

"Negligence must be established by the evidence. Plaintiff bears the burden of proving by a preponderance of the evidence that the defendant was negligent and that this negligence was the proximate cause *to any extent* [emphasis ours] of the plaintiff's alleged injuries.

"As I have already told you, this cause of action for negligence has been brought under the Jones Act. Under this statute, the employer may be held liable if his negligence *played any part, even the slightest part,* [emphasis ours] in producing the injuries for which the damages are sought.

"The obligation of a shipowner under the Jones Act for safety of seamen is substantially greater than that of an ordinary employer to his employees. The word negligence, therefore, as used in the Jones Act, which makes the employer of a seaman liable for negligence must be given a liberal interpretation. It includes any breach of any obligation that the employer owes to a seaman, including the obligation of seeing to the safety of the crew."

Near the end of the fairly long charge the judge referred again to proximate cause:

"I have already instructed you on the word proximate cause. Under the Jones Act an employer's negligence is deemed to have caused the injury of the seaman *if this negligence played any part, even the slightest in producing such injury* [emphasis ours].

"But, the plaintiff has the burden of proving that the defendant's negligence, if any, was a proximate cause of the injuries of which the plaintiff complains."

We observe first that with the "proximate cause" language appearing in the interrogatories the jury nevertheless held Sea-Drilling liable. The language did not cause the jury to find against the plaintiff; it found for him on the issue of liability.

We need not rest our decision on that point, however, for we are of the opinion that the instructions and interrogatories substantially complied with *Page*, supra.

As to causation, *Page* held:

"Liability is based upon negligence having a causal connection with the injury, and both the Supreme Court and this Circuit are committed to that proposition (cases cited in the footnote)". 312 F.2d at 87.

Again, it was said:

"This case does not call for any wholesale condemnation of the use of language of proximate causation in cases under this Act. Our holding is

confined to the instructions and facts of this particular case." 312 F.2d at 92.

The point in the *Page* decision was, and is, that the defendant is liable for damages resulting in whole or in part from its negligence, citing the language in Rogers v. Missouri Pacific Railroad Company, 1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."

In the case now before us the District Court clearly charged the jury, not once but three times, in keeping with this standard.

In the face of repeated instructions which fully informed the jury of the approved standard, all of which resulted in a verdict for the plaintiff on liability, we perceive no reversible departure from *Page*, supra. See, also, Unto v. Moore-McCormack Lines, Inc., 3 Cir., 1961, 293 F.2d 26; Funseth v. Great Northern Railway, 9 Cir., 1968, 399 F.2d 918; and Olsen v. State Line, 9 Cir., 1967, 378 F.2d 217.

The judgment of the District Court is Affirmed.